McGUIREWOODS LLP
1345 Avenue of the Americas
Seventh Floor
New York, New York 10105
Telephone:    (212) 548-2163
Facsimile:    (212) 548-2171
Patrick L. Hayden
Nathan S. Greenberg

*Proposed Attorneys for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
                                                      :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Dawson International Investments (Kinross) Inc., | : | Case No. 16-11551 (JLG) |
| a Delaware corporation, | : | |
| | : | Joint Administration Requested |
| Debtor. | : | |
| | : | |

-----------------------------------------------------------X
                                                      :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Dawson International Properties, Inc., | : | Case No. 16-11552 (JLG) |
| a Delaware corporation, | : | |
| | : | Joint Administration Requested |
| Debtor. | : | |
| | : | |

-----------------------------------------------------------X
                                                      :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Ilion Properties, Inc., | : | Case No. 16-11550 (JLG) |
| a New York corporation, | : | |
| | : | Joint Administration Requested |
| Debtor. | : | |
| | : | |

-----------------------------------------------------------X

1

```
-----------------------------------------------------------X
                                             :
In re:                                       :          Chapter 11
                                             :
DCC USA Inc.,                                :          Case No. 16-11553 (JLG)
a Delaware corporation,                      :
                                             :          Joint Administration Requested
        Debtor.                              :
                                             :
-----------------------------------------------------------X
                                             :
In re:                                       :          Chapter 11
                                             :
Dawson Luxury Garments LLC,                  :          Case No. 16-11554 (JLG)
a Massachusetts limited liability company,   :
                                             :          Joint Administration Requested
        Debtor.                              :
                                             :
-----------------------------------------------------------X
```

## <u>DECLARATION OF DAVID G. COOPER IN ACCORDANCE WITH LOCAL RULE 1007-2</u>

David G. Cooper hereby declares under penalty of perjury under the laws of the United

States of America that the following is true and correct:

1.      If called to testify, I would attest to the facts described herein.

2.      I am the President of Dawson International Investments (Kinross), Inc.

("**<u>DIIKI</u>**"), a Delaware corporation, which is the direct or indirect parent of each of the other

above-captioned debtors and debtors-in-possession (collectively, the "**<u>Debtors</u>**").[1]  I am the sole

director of four of the Debtors: DIIKI; Dawson International Properties, Inc. ("**<u>DI Properties</u>**") a

Delaware corporation; Ilion Properties, Inc. ("**<u>Ilion</u>**"), a New York corporation; and DCC USA

Inc. ("**<u>DCC USA</u>**"), a Delaware corporation.  I am also a manager of Dawson Luxury Garments

---

[1] The Debtors in these cases along with the last four digits of their federal tax identification number are: Dawson
International Investments (Kinross) Inc. (7624); Dawson International Properties, Inc. (1323); Ilion Properties, Inc.
(5838); DCC USA Inc. (8757); and Dawson Luxury Garments LLC (n/a).

LLC (formerly Dawson Cashmere LLC) d/b/a Dawson Forte ("**Forte**"), a Massachusetts limited liability company.

3.      Dawson International PLC, a United Kingdom public limited company ("**Dawson UK**"), is the sole shareholder of DIIKI.  Dawson UK was placed in administration in Scotland on August 15, 2012.  The affairs, business and property of Dawson UK are being managed by Blair Nimmo of KPMG, as administrator (the "**Dawson UK Administrator**").  As of the date hereof, Dawson UK is being liquidated.

4.      I joined Dawson UK, the ultimate parent company of the Debtors, in 1986 as a financial accountant.  I was appointed Group Finance Director of Dawson UK in January 2002 and was also appointed a director of all of its subsidiary companies, including the Debtors.  As a consequence of Dawson UK being placed into administration in 2012, my employment contract with Dawson UK terminated.  I was retained, however, on a consultancy basis by the Dawson UK Administrator to assist in the liquidation process.  I established a consultancy company (DC Consulting Limited) which initially provided services to Dawson UK and the Debtors, but for the last two years, approximately, has provided services only to the Debtors (and to other third parties).  I retained my directorships of the Debtors to facilitate this process, and, accordingly, I retained overall responsibility for the financial and business affairs of the Debtors.  I share this responsibility with James D. Byrnes, who is Vice President of DI Properties, Ilion, Forte and DCC USA, and is also a manager of Forte.  Mr. Byrnes also established a consultancy company (Tashmoo Partners LLC) to provide services to the Debtors.  Accordingly, I am familiar with the Debtors' business and financial affairs.[2]

---

[2] I also remain a director of Dawson UK, but, because of the administration proceedings, the Dawson UK Administrator possesses all corporate authority for Dawson UK, and I do not possess any director authority for Dawson UK.

5.      The Debtors' books and records are maintained by me and/or DC Consulting

Limited and by James D. Byrnes and/or Tashmoo Partners LLC.[3]

6.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced a

voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**")

in the United States Bankruptcy Court for the Southern District of New York. The Debtors are

authorized to operate their business as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  The Debtors have sought an order directing that their cases be

jointly administered for procedural purposes only by this Court.  No chapter 11 trustee or

examiner has been appointed in any of the Debtors' cases.

7.      I submit this declaration (the "**Declaration**") in support of the Debtors' chapter 11

petitions and the relief requested in the initial motions described herein (the "**Initial Motions**"),[4]

and to provide particular information to the Court and parties in interest in accordance with Rule

1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern

District of New York (the "**Local Rules**").  Except as otherwise indicated, all facts set forth in

this Declaration are to the best of my knowledge, and are based upon my personal knowledge,

information supplied to me by my colleagues, and from my review of relevant documents, or

otherwise upon my opinion based upon my experience, my discussions with the Debtors'

advisors, and my knowledge of the Debtors' operations and financial condition.

8.      Part I of this Declaration describes the Debtors' corporate structure, their

businesses, and the circumstances leading to the filing of these cases, as required by Local Rule

1007-2.  Part II of this Declaration sets forth my basis for testifying to the facts underlying and

described in each of the Initial Motions.  Part III of this Declaration and accompanying exhibits

---

[3] Certain of the Debtors' books and records may also be in the possession of Deloitte, the Debtors' accountant.
[4] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the applicable
Initial Motion.

contain schedules providing additional information about the Debtors that is required to be

provided pursuant to Local Rule 1007-2.

### I.   THE DEBTORS' CORPORATE STRUCTURE, BUSINESS, AND CIRCUMSTANCES LEADING TO THE FILING

**A.    The Debtors' Corporate Structure**

9.    The Debtors are comprised of five separate entities. DIIKI is the successor by

merger to Dawson International Holdings (U.S.A.) Inc., a Delaware corporation ("**DI**

**Holdings**").  DI Holdings was, and DIIKI now is, parent to DI Properties.  DIIKI is also parent

to Ilion and to DCC USA, which, in turn, is parent to Forte.  Certain non-debtor affiliates were

also owned directly or indirectly by DIIKI; these non-debtor affiliates had no known assets and

no known liabilities other than potential liability in regard to the Pension Plan (as defined

below).  A current organizational chart identifying each of the Debtors is attached hereto as

Exhibit A.

10.    The Debtors are privately owned, and no debt or equity securities of any Debtor

are currently listed or traded on any public securities exchange or market.  As stated above,

Dawson UK is the parent of DIIKI.

**B.    The Debtors' Business**

11.    None of the Debtors currently has an operating business, and each of the Debtors

is in the process of winding down.  This bankruptcy filing will allow the Debtors to determine

and establish allowed claims against their estates including regarding potential environmental

liabilities, address the disposition of the Pension Plan, and make appropriate distributions to

creditors under a plan of liquidation.

12.    For many years, certain of the Debtors (other than Forte), and related entities,

were engaged in different aspects of the textile manufacturing industry with a number of

operating facilities including those further described below at locations in North Carolina and

New York, while certain Debtors were holding companies.  Acquired in 1996, Forte was

engaged in the business of designing, sourcing (primarily from China), distributing and

marketing textiles, including cashmere and cashmere blend knitwear and accessories in the

United States.  Forte had no manufacturing operations.

13.     By the early 2000s, all of the Debtors had ceased business operations except for

Forte.  Forte was headquartered in South Natick, Massachusetts.  Forte continued to design,

source, distribute and market cashmere and cashmere blended knitwear until May 2014 when,

following an independent sale process conducted by KPMG USA, its assets were sold to, and

certain liabilities assumed by, the former management of Forte (not including Mr. Byrnes or

myself).

14.     In conducting their businesses, certain of the Debtors, or certain of their former

affiliates, currently own or previously owned the following parcels of real property:

    a.  200 NC Highway 24/27 Bypass, Albemarle, North Carolina ("**Albemarle

       Property**");

    b.  502 Mitchell Street, Kings Mountain, North Carolina ("**Kings Mountain

       Property**");

    c.  1135 Montgomery Avenue, Albemarle, North Carolina ("**Montgomery Avenue

       Property**"); and

    d.  7 Spruce Street, Village of Ilion, Herkimer County, New York ("**Ilion

       Property**").

15.     As explained further below, through certain transactions, certain of the Debtors

assumed some of the liabilities associated with the properties.

**Albemarle Property**

16.      Jefferies Associates, Inc. ("**Jefferies**"), a commission dyeing company, owned the

Albemarle Property.  Jefferies was acquired by DI Holdings in 1990.  In 1994, the ownership of

Jefferies was transferred to J.E. Morgan Knitting Mills, Inc. ("**Morgan**"), which was in turn

owned by DI Holdings.  In 1999, upon the sale of the stock of Morgan (as described further

below), the stock of Jefferies was transferred back to DI Holdings.

17.      Certain remediation work had commenced at the Albemarle Property in 1999,

with a pump-and-treat extraction system pertaining to groundwater contamination.  In May 2000,

Jefferies sold the Albemarle Property to Uwharrie Storage Center Inc. ("**Uwharrie**") for

$350,000.  Under the agreement with Uwharrie, Jefferies retained the responsibility for

remediating certain environmental liabilities to the extent identified in pre-sale environmental

reports.

18.      In 2003, DI Properties (having assumed certain liabilities in regard to the

Albemarle Property as described further below) entered into a Corrective Action Plan with the

North Carolina Department of Environmental and Natural Resources, now known as the North

Carolina Department of Environmental Quality ("**NCDEQ**") in regard to the Albemarle

Property.

19.      With the Albemarle Property having been sold, and DI Properties administering

the remediation program, a certificate of dissolution for Jefferies was filed with the State of

Delaware in December 2002.

20.      Payments made on account of the remediation program (inclusive of professional

fees) for the Albemarle Property in the past five years have been approximately $102,000 for

2015/16; $53,000 for 2014/15; $36,000 for 2013/14; $ 63,000 for 2012/13; and $109,000 for

7

2011/12.  It is not possible to determine the remaining duration of the remediation project accurately.

**Kings Mountain Property**

21.      In 1989, Dawson Consumer Products Inc. ("**DCPI**"), a subsidiary of DI Holdings (which later merged into DIIKI), acquired certain assets and assumed certain liabilities of the Consumer Products Group division of Reeves Brothers Inc. and Cinderella Knitting Mills Inc. Upon information and belief, Dawson UK indemnified Reeves Brothers for certain liabilities arising out of this transaction.  The assets acquired by DCPI included the Kings Mountain Property.

22.      In 1993, DCPI sold the Kings Mountain Property to Beltex Corporation ("**Beltex**").  Under the agreement with Beltex, DCPI retained certain potential environmental liabilities at the Kings Mountain Property.

23.      In March 1995, DCPI merged into Morgan.

24.      There is an Interim Corrective Action Plan from approximately 1997 in regard to the Kings Mountain Property.  A pump-and-treat extraction system has operated since 1998.  In addition, a soil vapor extraction system operated from 1998 to 2007.

25.      Upon information and belief, the United States Environmental Protection Agency has recently begun reviewing environmental issues at the Kings Mountain Property.

26.      Payments made on account of the remediation program at the Kings Mountain Property in the past five years have been approximately $2,000 for 2015/16; $14,000 for 2014/15; $32,000 for 2013/14; $38,000 for 2012/13; and $36,000 for 2011/12.  It is not possible to determine the remaining duration of the remediation project accurately.

27.     DI Properties assumed certain environmental liabilities for the Kings Mountain Property, as explained further below.

## Montgomery Avenue Property

28.     In the 1989 transaction noted above, the assets acquired by DCPI from Reeves Brothers included the Montgomery Avenue Property.

29.     As noted above, upon information and belief, Dawson UK indemnified Reeves Brothers for certain liabilities arising out of the 1989 transaction.

30.     DCPI merged into Morgan in March 1995.  In August 1996, Morgan sold the Montgomery Avenue Property to Arrowood, Inc.

31.     In 2010, NCDEQ sent a "Notice of Regulatory Requirement for Contaminant Assessment and Cleanup" in regard to the Montgomery Avenue Property to Reeves Brothers.

32.     In 2011, Reeves Brothers or its successor, forwarded such notice to Dawson UK. The Debtors are unaware of any further action taken in regard to this notice.  No party has asserted any environmental claim against any of the Debtors in regard to the Montgomery Avenue Property.

## Ilion Property

33.     In July 1986,  Duofold, Inc. (a newly established subsidiary of DI Holdings) ("**New Duofold**") acquired the assets and business of an entity also called Duofold, Inc., a subsidiary of Cluett, Peabody & Co., Inc.  In the same transaction, Ilion (a subsidiary of DI Holdings) acquired the Ilion Property.

34.     The operations of New Duofold were absorbed into those of Morgan with Morgan/New Duofold operating from the Ilion Property until approximately 1998, at which time operations ceased at the Ilion Property.  While operating at the Ilion Property, Morgan/New

9

Duofold paid an annual rental to Ilion.  Ilion continues to own the Ilion Property, but the Ilion

Property has not been operated by any party since 1998, other than for use as storage from time

to time.

35.        Morgan/New Duofold operated the Ilion Property as a cut-and-sew facility and

the Debtors do not believe such operations resulted in significant environmental contamination

of the Ilion Property, if any.  However, the Debtors are aware that the site has a long history of

industrial use.  In January, 2015 a Phase II investigation was done for the New York State

Department of Environmental Conservation ("**NYSDEC**"), which indicated there was some

contamination on the site but not extensive or significant contamination.

36.        The Ilion Property contains an above-ground petroleum storage tank which

contains approximately 10,000 gallons of fuel oil.  In May 2015, the NYSDEC sent a notice of

Motion for Order Without Hearing for violations of the Environmental Conservation Law

Section 17-1009(2) and 6 NYCRR Part 613.9(b)(1) to Ilion.  The notice requires that Ilion,

among other things, (i) permanently close the petroleum storage tank; (ii) register the petroleum

storage tank with the Department of Environmental Conservation and pay a back-registration fee

of $1,000; and (iii) be assessed a civil penalty of at least $60,000 for violation of environmental

law, but suspending payment of $50,000 provided Ilion complies with the order.  Prior to the

Petition Date, the Debtors received estimates for the cost of removal of the tank ranging from

approximately $50,000 to approximately $85,000.[5]  Ilion communicated to NYSDEC that it was

unclear whether there were sufficient funds to address the issue at that time.  Ilion has heard

nothing further regarding this administrative action.

---

[5] The Debtors provide these estimates for informational purposes only, and, accordingly, they are provided without prejudice.  The Debtors reserve the right to determine and assert any liabilities in amounts different than the estimates stated herein, and to object to claims asserted by any party in regard thereto on any grounds.

37.     Prior to the Petition Date, the Debtors considered entering the Ilion Property into the Brownfields program operated by the NYSDEC.  However, the Debtors determined that it was unclear whether there were sufficient funds to allow them to enter the Ilion Property into the program at that time.  Additionally, prior to the Petition Date, the Debtors discussed with the Village of Ilion the possible acquisition of the Ilion Property by the Village of Ilion through the Brownfields program.

38.     At various times prior to the Petition Date, the Debtors attempted to market, sell or otherwise dispose of the Ilion Property.  The Debtors have been unable to identify a buyer on any terms at this time.

**Sara Lee Agreement**

39.     By agreement dated August 1999, DI Holdings sold the stock of Morgan to Sara Lee Corporation (the "**Sara Lee Agreement**").  In conjunction with the Sara Lee Agreement, certain of the Debtors, including DI Properties, assumed certain liabilities pertaining to Morgan, which potentially include certain environmental liabilities pertaining to the real property described herein.  Additionally, a number of properties were excluded from the sale, and the Sara Lee Agreement specified that DI Holdings or another affiliate of Dawson UK would assume these excluded assets (the "**Excluded Assets**").

40.     The Sara Lee Agreement contains a provision whereby DI Holdings (now DIIKI) and Dawson UK indemnified Sara Lee and Morgan for certain matters possibly including the environmental liabilities at the Albemarle Property and at the Kings Mountain Property.

41.     Accordingly, certain of the Debtors, as explained herein, have potential, but unknown, environmental liabilities at the Albemarle Property, the Kings Mountain Property, the Montgomery Avenue Property and/or the Ilion Property.

11

**Other Obligations of the Debtors**

Pension Plan

42.     In 1999, pursuant to the sale of Morgan to Sara Lee, DI Holdings became the sponsor of the Dawson Consumer Products Employee Benefits Plan (the "**Pension Plan**").  Upon the merger of DI Holdings into DIIKI in 2003, DIIKI became the sponsor of the Pension Plan. The Pension Plan is a tax-qualified, defined benefit, single-employer pension plan.

43.     In the bankruptcy process, it is anticipated that the Pension Plan will be terminated, either under a standard termination process, or a distressed termination process. Prior to the Petition Date, the Debtors received an estimate that the cost of the standard termination of the Pension Plan would be approximately $3.4 million.  The Debtors also received an estimate that the liability associated with a distressed termination of the Pension Plan would be in the same approximate range.[6]

Intercompany Debts

44.     DIIKI is obligated to Dawson UK on account of a loan in the approximate amount of $1.5 million.  This debt arose prior to the administration of Dawson UK in 2012, and some or all of it arose from the cash management system described below.

45.     DIIKI is obligated to Forte on account of intercompany debt in the approximate amount of $439,000.  This debt reflects expenses paid by Forte in April and May 2016.

46.     DIIKI is obligated to DI Properties on account of intercompany debt in the approximate amount of $29,000.

---

[6] The Debtors provide these estimates for informational purposes only, and, accordingly, they are provided without prejudice.  The Debtors reserve the right to determine and assert the liabilities associated with either a standard termination or a distressed termination of the Pension Plan in amounts different than the estimates stated herein, and to object to any claims asserted by any party in regard thereto on any grounds.

47.     Ilion is obligated to DIIKI on account of intercompany debt in the approximate amount of $159,000.

48.     DCC USA is obligated to DIIKI on account of intercompany debt in the approximate amount of $4.4 million.  This is an historical balance that has not changed in over ten years.

Other Debts

49.     Upon information and belief, except as described above, and other than professional and consultant expenses, the remaining claims against the Debtors are *de minimis*.

**C.     Events Leading to the Filing of the Debtors' Cases**

50.     All real property of the Debtors was sold by 2004, except for the Ilion Property. All operating business of the Debtors had ceased by 1999, except for the operations of Forte.

51.     After Dawson UK was placed in administration in 2012, Forte's operating assets were sold in 2014, and certain liabilities were assumed by the purchaser.  The proceeds of such sale and Forte's existing cash on hand were the only liquid assets retained by the Debtors.

52.     As of the Petition Date, Forte held the approximate sum of $5.3 million in cash. Such cash is held in a bank account in the name of DCC USA.

53.     After the cessation of the Debtors' operating businesses (other than Forte's business) in 1999, the Debtors' cash management was effectuated as follows:

      a.     The only US bank account maintained was the Forte bank account. This bank account was in the name of DCC USA.  All cash transactions of the Debtors were made to/from that account.

      b.     During the course of the year, Forte built up intercompany balances with each of the Debtors according to its net expenditure. Typically, these would be for:

     i.  DIIKI: Pension contributions, professional fees and minor administration costs.

     ii.  DI Properties: Any receipts from properties sold, and payments in respect of environmental remediation costs and associated professional fees.

     iii.  Ilion: Real estate taxes, and professional fees.

c.  At the year-end, these intercompany balances with Forte would normally be settled:

     i.  Prior to the Dawson UK administration in 2012,

         A. Forte made dividend payments, based on a proportion of its profit for the year, to Dawson UK (effectively flowing through DCC USA and DIIKI); and

         B. Forte was reimbursed for the intercompany balances which had arisen with US affiliates during the year either by reducing the amount of the dividend paid to Dawson UK or by subsequent reimbursement of cash by Dawson UK effectively transferring the intercompany balances owed by DIIKI to Dawson UK. In each case, the balances owed by DI Properties and Ilion were transferred to DIIKI.

     ii.  Following the Dawson UK administration in 2012, Forte declared dividends to DIIKI equal to the amount of the intercompany balances which had arisen, effectively extinguishing any balance due by DIIKI and transferring the intercompany balances owed by DI Properties and Ilion to DIIKI.

54.    All intercompany transactions made as a result of this system were recorded in the Debtors' books and records either as dividends or intercompany loans and debited or credited to each entity, as appropriate.

55.    The remaining assets of the Debtors include, on a consolidated basis, Forte's cash in the approximate amount of $5.3 million, and the Ilion Property.

56.    Given (a) the contingent, unliquidated and unknown nature of the extent of the

potential environmental claims, (b) the necessity to terminate the Pension Plan, (c) the limited

amount of funds that the Debtors hold on a consolidated basis, and (d) current management's

detailed familiarity with the Debtors' business, history and outstanding issues, the Debtors

determined in their business judgment that the most effective and efficient manner in which to

wind down is through a liquidating Chapter 11 plan.

## II.    __INITIAL MOTIONS AND OTHER PLEADINGS__

57.    To facilitate the expeditious and efficient administration of these liquidating

Chapter 11 cases, the Debtors seek various types of relief in their Initial Motions, all of which

are either being filed concurrently with this Declaration, or are anticipated to be filed shortly

after the Petition Date.  I believe the relief requested in the Initial Motions is necessary, and

appropriate, and is in the best interest of the Debtors, their estates, creditors and other parties in

interest.

58.    Because the Debtors do not have operating businesses, and have no known

secured creditors, the Debtors believe the Initial Motions can be scheduled for hearing by the

Court in the ordinary course (i.e., the Debtors are not seeking expedited hearings on the Initial

Motions).

59.    The Initial Motions are:

   a.    Motion for order allowing the joint administration of the Debtors' bankruptcy

         cases pursuant to Bankruptcy Rule 1015(b);

   b.    Motion for order authorizing the Debtors' employment and retention of

         professionals in the ordinary course of business;

15

     c.   Motion for order authorizing the Debtors' use of a cash management system, use of post-petition intercompany loans, and administrative expense status for post-petition intercompany loans; and

     d.   Motion for order setting a bar date for filing proofs of claim, approving the form and manner for filing proofs of claim, and approving notice thereof.

60.    I have reviewed each of the Initial Motions (including the exhibits and schedules thereto) listed above, and, to the best of my knowledge, I believe the facts set forth in the Initial Motions are true and correct. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the Initial Motions.

61.    Furthermore, as the result of my personal knowledge, information supplied to me by other members of the Debtors' management and from my colleagues who perform services for the Debtors, from my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtors' advisors and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the Initial Motions is necessary for the Debtors to effectuate a smooth transition into Chapter 11, to avoid harm to their estates, and is in the best interests of the Debtors' creditors, estates and other stakeholders.

62.    Accordingly, for the reasons stated herein and in each of the Initial Motions, I believe that the relief sought in the Initial Motions should by granted by the Court in its entirety, together with such other and further relief for the Debtors as this Court deems just and proper, in the most expeditious manner possible.

### III.        INFORMATION REQUIRED BY LOCAL RULE 1007-2

**A.        General Information**

63.      I understand that Local Rule 1007-2 requires the Debtors to disclose certain information related to their cases, which is provided hereinafter and/or in the exhibits attached hereto.

64.      There was no committee organized prior to the Petition Date.

65.      Attached hereto as <u>Exhibit B</u> and incorporated herein by reference is a list of the names, addresses, and telephone numbers of the creditors holding the 20 largest unsecured claims against the Debtors, excluding insiders, on a consolidated basis.  The list includes the amount of the claim, the nature of the claim, and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed or partially secured.

66.      The Debtors have no known secured creditors.

67.      Attached hereto as <u>Exhibit C</u> and incorporated herein by reference is an unaudited, consolidated summary of the assets and liabilities of the Debtors.

68.      The Debtors have no shares of stock, debentures or other securities that are publicly held.

69.      None of the Debtors' property is in the possession of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor.

70.      The only premises owned by any of the Debtors is the Ilion Property.  The Debtors have no other premises owned, leased or held under other arrangement from which they operate their business.

71.      Other than the Ilion Property, the Debtors' only substantial asset is a bank account containing approximately $5.3 million held in an account at Bank of America in Boston.

17

72.     There are no actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against them or a seizure of their property is imminent except as noted herein.

73.     The Debtors' current management consists of two persons:

a. David G. Cooper

   i. Paragraphs 2 and 4 hereof are incorporated by reference.

   ii. Prior to the Petition Date, in the ordinary course of business, the Dawson UK Administrator paid DC Consulting Limited for my time on an hourly basis, at the most recent hourly rate of £107.  In turn, DIIKI reimbursed the Dawson UK Administrator for the work pertaining to the Debtors, with the funds being provided by Forte under the system described above.  Under this arrangement, I did not directly receive any remuneration from any of the Debtors for my services as director, manager or officer.  Prior to the Petition Date, no written contract governed this arrangement.  Certain of the Debtors indemnified me pursuant to indemnity agreements executed in 2013 and 2014.

   iii. In October 2014, I was appointed as a non-executive director with Leeds Group PLC, which was a major shareholder of Dawson UK.

   iv. Beginning on the Petition Date, in the ordinary course of business, the Debtors will continue to utilize the same compensation system, to-wit: the Dawson UK Administrator will pay DC Consulting Limited for my time at the hourly rate of £107, and DIIKI, through Forte, will reimburse the Dawson UK Administrator for the work pertaining to the Debtors.

18

b.  James D. Byrnes:

　　i.  James D. Byrnes is the Vice-President of four of the Debtors, each of
which is a direct or indirect subsidiary of DIIKI: DI Properties, Ilion, DCC
USA, and Forte (Mr. Byrnes is also a manager of Forte).  Prior to joining
Forte, Mr. Byrnes was US-Finance director of Lantor, Inc., a subsidiary of
Coats Viyella PLC.  Mr. Byrnes joined Forte as director of finance in
2000.  Mr. Byrnes' duties also included oversight of the Debtors' real
property in the United States.  After Dawson UK entered administration in
2012, the Dawson UK Administrator asked Mr. Byrnes to continue to
assist with the Debtors, in his capacity as director of finance for Forte.
After Forte's assets were sold in 2014, Mr. Byrnes ceased being an
employee of Forte, but continued his work for the Debtors on a
consultancy basis.  Mr. Byrnes established a consultancy company
(Tashmoo Partners LLC) to provide services to the Debtors.

　　ii.  Accordingly, prior to the Petition Date, in the ordinary course of business,
DIIKI paid Tashmoo Partners LLC for Mr. Byrnes' time on an hourly
basis, at the most recent hourly rate of $275, with the funds being
provided by Forte under the system described above.  Under this
arrangement, Mr. Byrnes did not directly receive any remuneration from
any of the Debtors for his services as manager or officer.  Prior to the
Petition Date, a written contract between Tashmoo Partners LLC and
DIIKI governed this arrangement.  Certain of the Debtors indemnified Mr.
Byrnes pursuant to indemnity agreements executed in 2013 and 2014.

   iii. Beginning on the Petition Date, in the ordinary course of business, the

    Debtors will continue to utilize the same compensation system, to-wit:

    DIIKI, through Forte, will pay Tashmoo Partners LLC for Mr. Byrne's

    time at the hourly rate of $275.

**B.**  **The Debtors' Intentions as to the Operation of their Business**

  74.  While the Debtors have no operating business, the Debtors intend to continue as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code while they

wind down and liquidate.

  75.  Attached hereto as <u>Exhibit D</u> and incorporated herein by reference is the Debtors'

estimate of amounts to be paid to officers, directors and financial and business consultants

retained by the Debtors, for the 30 day period following the Petition Date.  The Debtors have no

employees, and, accordingly, there is no weekly payroll.

  76.  Attached hereto as <u>Exhibit E</u> and incorporated herein by reference is a list of the

estimated consolidated cash receipts and disbursements, net cash gain or loss, and obligations

and receivables expected to accrue but remain unpaid, other than professional fees, for the 30

day period following the Petition Date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, executed on May 27, 2016.


Dated May 27, 2016                            /s/ David G. Cooper
                                              David G. Cooper

**<u>EXHIBIT A</u>**

**CORPORATE ORGANIZATION CHART**

# DAWSON CORPORATE ENTITIES



## EXHIBIT B

**LIST OF TWENTY LARGEST CREDITORS**

---

**Fill in this information to identify the case:**

Debtor name  Dawson International Investments (Kinross) Inc.

United States Bankruptcy Court for the:  Southern  _____ District of  New York
(State)

Case number (If known):  _____

☐ Check if this is an amended filing

---

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders  (Consolidated with affiliated debtors)    12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Pension Benefit Guaranty Corporation 1200 K Street, N.W. Washington, DC 20005-4026 | T: (202) 326-4000 | Estimated Potential Underfunded Pension Liability | Contingent Unliquidated Disputed | | | $ 3,400,000.00 |
| 2 | Herkimer County Office of County Treasurer 108 Court Street, Suite 3100 Herkimer, NY 13350-2928 | T: (315) 867-1146 | Real Property Taxes | | $ 22,173.18 | unknown | $ 22,173.18 |
| 3 | City of Albemarle Albemarle City Hall 144 North 2nd Street Albemarle, NC 28001 | T: (704) 984-9605 | Electric/Water | | | | $ 750.00 |
| 4 | GRM Information Management 215 Coles Street Jersey City, NJ 07310 | T: (201) 798-7100 | Record Storage | | | | $ 280.00 |
| 5 | Dawson Forte LLC 40 Shawmut Road Canton, MA 02021 | Andrew Bartness T: (781) 467-0170 | Record Storage | | | | $ 275.00 |
| 6 | Safeguard Records One Brussels Street Worcester, MA 01610 | T: (508) 795-1015 | Record Storage | | | | $ 108.00 |
| 7 | North Carolina Department of Environmental Quality 1646 Mail Service Center Raleigh, NC 27699 | James Bateson Chief, Superfund Section T: (919) 707-8329 james.bateson@ncdenr.gov | Potential Environmental Liability | Contingent Unliquidated Disputed | | | Unknown |
| 8 | New York State Department of Environmental Conservation 317 Washington Street Watertown, NY 13601 | Nels G. Magnuson Assistant Regional Attorney, Region 6 T: (315) 785-2238 | Potential Environmental Liability | Contingent Unliquidated Disputed | | | Unknown |

Debtor  Dawson International Investments (Kinross) Inc.
Name

Case number *(if known)*_____

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 9 | United States Environmental Protection Agency Region 4 61 Forsyth Street, S.W. Atlanta, GA 30303-8931 | Bianca N. Jaikaran Associate Regional Counsel T: (404) 562-9680 jaikaran.bianca@epa.gov | Potential Environmental Liability | Contingent Unliquidated Disputed | | | Unknown |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | | | | | | | |
| 19 | | | | | | | |
| 20 | | | | | | | |

## <u>EXHIBIT C</u>

## UNAUDITED CONSOLIDATED BALANCE SHEET
## AS OF MAY 24, 2016

|  | $000 |
|---|---|
| **Current assets** | |
| Cash | 5,317 |
| **Total Assets** | 5,317 |
| | |
| **Liabilities** | |
| Accounts payable and accrued expenses | 73 |
| Loan due to parent company | 1,540 |
| Employee benefit plan obligation[1] | 2,919 |
| Provision for environmental costs | 681 |
| **Total liabilities** | 5,213 |
| | |
| Common stock | - |
| Additional paid in capital | 143,179 |
| Retained losses | (142,737) |
| Loss for current year | (338) |
| **Total shareholders' equity** | 104 |
| **Total liabilities and equity** | 5,317 |

[1]FASB ASC 715-20 basis

25

## EXHIBIT D

## WEEKLY PAYMENTS

Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount to be paid to the Debtors' officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30 day period following the filing of the chapter 11 petitions

|  | ACCRUED | PAID |
|---|---|---|
| PAYMENTS TO OFFICERS, STOCKHOLDERS AND DIRECTORS | $10,000 | Nil |
| PAYMENTS TO FINANCIAL AND BUSINESS CONSULTANTS | $20,000 | Nil |

Note: It is expected that costs will accrue but will not be paid within the 30 day period.

## EXHIBIT E

### ESTIMATED CASH RECEIPTS AND DISBURSEMENTS

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30 day period following the filing of the chapter 11 petitions, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| CASH RECEIPTS | $NIL |
| CASH DISBURSEMENTS | $NIL |
| NET CASH GAIN OR LOSS | $NIL |
| UNPAID OBLIGATIONS | UNKNOWN |
| UNPAID RECEIVABLES | $NIL |

75299458_19